**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

|   |   |   |
|---|---|---|
| | : | |
| MICHELE VELTRI, JOHN | : | |
| MASTROPIERRO, CLAYTON BISHOP, | : | |
| JOHN LAMARTINA, AND DIANA | : | |
| BETTS, | : | |
| | : | Civil Action No. 08-00915 (PGS) |
| Plaintiffs, | : | |
| | : | OPINION |
| v. | : | |
| | : | |
| ABBOTT SEVERANCE PAY PLAN FOR | : | |
| EMPLOYEES OF KOS | : | |
| PHARMACEUTICALS, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

SHERIDAN, U.S.D.J.

This case comes before the Court on cross motions for summary judgment filed by

Defendant, Abbott Severance Pay Plan For Employees of Kos Pharmaceuticals, and Plaintiffs,

Michele Veltri ("Veltri"), John Mastropierro ("Mastropierro"), Clayton Bishop ("Bishop"), John

Lamartina ("Lamartina"), and Diana Betts ("Betts") (collectively "Plaintiffs").  Plaintiffs initiated

this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132

*et seq.*.

**STATEMENT OF FACTS**

Plaintiffs are former pharmaceutical sales employees of Kos Pharmaceuticals ("Kos").  Kos

manufactured proprietary pharmaceutical products such as Niaspan and Advicor for the treatment

of chronic cardiovascular and respiratory diseases. (First Am. Compl. ¶3.) At some point in 2006, Kos underwent acquisition.  As a result of the acquisition process, the Board of Kos determined that its employees should be treated fairly upon acquisition. Accordingly, Kos adopted and implemented the Kos Pharmaceuticals Change in Control Severance Plan for its employees ("Severance Plan"). (*Id.* ¶ 4.)

Thereafter, on or about December 15, 2006, Abbott Laboratories ("Abbott") acquired Kos and agreed to maintain and administer the Severance Plan for former Kos employees. (Administrative Record "AR" at 1.)[1]

On January 24, 2007, Abbott adopted the Severance Plan, but renamed it the Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals without changing its major terms.[2]  (*Id.*) The Severance Plan provided a certain level of benefits to Kos employees if their employment terminated under certain specified circumstances before December 16, 2007. (*Id.* at 2-19.)  Once Abbott took control, the Severance Plan's sponsor changed to Abbott's Divisional Vice President, Employee and Labor Relations ("Administrator") who administered the Severance Plan.  (*Id.* at 14, 36.)

## Plan Eligibility

The Severance Plan provided severance benefits to sales and marketing representatives in the event of a change in control of Kos and prior to December 16, 2007. (First Am. Compl. ¶ 4.) The

---

[1] The Administrative Record was filed on March 18, 2009. It is Bates-stamped AR 1 through AR 2753 and will be referenced herein using that numbering.

[2]    Despite the renaming of the Severance Plan by Abbott, it is still referred to as the Severance Plan herein.

Severance Plan was limited and provides benefits only if former Kos employees terminated their employment under qualifying circumstances following a "change in control". (AR at 23.)

The Severance Plan generally provides that if an eligible employee is terminated without cause or the employee has "Good Reason" to resign, the employee is entitled to certain severance pay and benefits, including a lump sum cash severance payment, a prorated annual bonus for the year in which the employment termination occurs, and continued health and welfare benefits for a certain period of time. (*Id.* at 6-7.)

The Severance Plan (Sect. IV) outlines the circumstances entitling a participant to certain pay and benefits if he or she incurs a "qualifying termination" and executes a Separation Agreement and Release. (*Id.* at 7-8.) In order to constitute a "qualifying termination," an employee must have been employed by Kos on December 15, 2006 (date of acquisition by Abbott) and, prior to December 16, 2007, either: (1) be involuntarily terminated, other than for cause; or (2) voluntarily terminates employment for "Good Reason." (*Id.* at 5-6.)

Under the terms of the Severance Plan, an employee who claims "Good Reason" for resigning must provide written notice that sets forth the specific conduct of the company the employee contends constitutes "Good Reason." (*Id.* at 4-5, 34.)

Section I.(o) of the Severance Plan defines "Good Reason" as:

> "Good Reason" means, with respect to any Participant and without such Participant's express written consent, the occurrence of any one or more of the following:
>
> (i) a greater than 10% reduction of the Participant's annual base salary, or any material reduction in the total cash compensation that the Participant is eligible to earn, from the level in effect immediately prior to December 15, 2006.
>
> (ii) any demotion or other significant reduction in the job responsibilities held by the Participant immediately prior to

3

December 15, 2006, or any significant change to the reporting relationships of the Participant as in effect immediately prior to December 15, 2006; or

(iii) any change of the Participant's principal place of employment to a location more than (i) in the case of Participants who are not sales personnel, 65 miles from the Participant's principal place of employment immediately prior to December 15, 2006, and (ii) in the case of Participants who are sales personnel, 50 miles from the Participant's principal residence immediately prior to December 15, 2006.

(*Id.* at 4.) Under the Severance Plan, the employee is required to give the company thirty (30) days advance written notice of his or her intent to resign, with an explanation of the good reason. (*Id.* at 5.) This notice must be sent to the Senior Manager, Employee Relations. (*Id.* at 34.)

**Interpretation of Severance Plan Terms**

The Severance Plan provides that the Administrator or its delegee "has the discretionary authority to interpret all Severance Plan provisions and to determine all issues arising under the Severance Plan, including issues of eligibility, coverage and benefits . ." The Administrator may delegate its responsibilities under the Severance Plan." (*Id.* at 14.)

According to the defendant, the Administrator exercised his authority to interpret various terms that the Severance Plan had not defined, and to create "uniform methodologies" of determining whether claimants fit within the definition of "Good Reason."[3] (*Id.* at 55, 62-96, 1652-1653, 2604-2605.)

One area of alleged ambiguity in the Severance Plan concerns the phrase "material reduction in total cash compensation." According to defendant, the Administrator determined that a "material"

---

[3]     Plaintiffs dispute the contention that the Administrator acted within its authority because the Severance Plan was not ambiguous or in need of interpretation.

reduction in cash compensation would be a 10 percent reduction.   According to the Administrator, this was used as a "guidepost consistent with the stated 10 % reduction in base salary" under the terms of the Severance Plan.  (*Id.* at 55.)   In order to consistently evaluate sales personnel claims for benefits, the Administrator established a "uniform methodology" of determining each sales employee's total cash compensation and memorialized this methodology in a one-page document ("Compensation Guidelines"). (*Id.* at 55-56.)  Defendant alleges that the Compensation Guidelines allowed the Severance Plan to apply a "uniform and consistent analysis" to claims for employees whose total cash compensation package included various components. (*Id.* at 55.)   The Compensation Guideline calculations do not match the actual amount a sales employee earned on December 15, 2006, the day of takeover.

According to the Compensation Guidelines, when a request for severance based on total compensation is under review, the Administrator does a two step analysis.  They are:

> (i)      The base salary that the employee earned prior to the change in the control and the base salary at the time of resignation are compared to assess any differences; and
> (ii)     The bonus earnings that an employee is eligible to earn prior to the change are assessed against the eligible bonus earnings at the time of the resignation.

(*Id.* at 55.)  According to the Administrator, because the Severance Plan premises "Good Reason" on "a greater than 10 % reduction of the Participant's annual base salary or any material reduction in the total cash compensation that the Participant is eligible to earn," the relevant inquiry was compensation an employee is eligible to earn,  as opposed to compensation actually earned by the employee.  Plaintiffs disagree with the Administrator's view because the "eligible to earn" clause is not ambiguous.

The Administrator also considered bonus categories such as (1) annual commission/bonus target; (2) average SPIF payments (a recurring payment based on the attainment of specific criteria); and (3) any transition bonus. (*Id.* at 55.)  Additionally, the Compensation Guidelines reflected that stock equity was not included in the calculation because such equity is not cash compensation and is excluded under the Severance Plan. (*Id.*)

Comparing the Compensation Guideline's calculation of salaries to the amount of compensation actually earned as of December 15, 2006, results in divergent outcomes.  For instance, Plaintiff Veltri argues that she earned $158,320 as a salesperson for Kos on the date of takeover; but as an Abbott employee her salary was slashed to $100,925.  Comparing these two figures there is more than a ten percent reduction in pay.  Veltri argues the reduction is a good reason to quit.  The Administrator does not agree.  The Administrator argues that Veltri was only "eligible to earn" $105,527 at the time of takeover, and comparing that amount to Abbott's salary of $100,925, there is less than a ten percent cut in pay. According to the Administrator, his result does not constitute a "good reason" to quit.  The Severance Plan arrived at it's salary calculation using a hypothetical, average "target" bonus for each position-type.  For example, the Compensation Guidelines state that the average target bonus for a "Rep" at Kos was $30,852 rather than actual payments prior to December 15, 2006.  (*Id.*)  Other plaintiffs incurred a similar result when the Severance Plan's "eligible to earn" hypothetical formula is utilized.

Another alleged good reason to quit occurs when a sales person's principal place of business is more than 50 miles from the salesperson's residence. The Severance Plan had difficulty determining how to measure fifty miles for two reasons. First, a salesperson's territory covers a broad area which is more than fifty miles to its farthest point, but within fifty miles at its nearest

6

point to the salesperson's home.  Secondly, the Administrator was uncertain if the fifty miles is measured "as the crow flies" or as driving mileage.  As a result, the Administrator retained a consultant, ZS Associates ("ZS"), to determine the "principal place of employment" for each sales force employee. (*Id.* at 62-96, 1652-53, 2603-04.)[4]  ZS recommended that the "workload center" should be used as the principal place of employment in determining distance from principal residence.  (*Id.* at 1653, 2604.)  The Administrator exercised his discretion and adopted ZS's recommendation to use the workload center as the "principal place of employment."  The workload center was defined as the "weighted center of the workload based on the physicians in the geography."  (*Id.* at 1679, 2705.)  Each physician in a particular employee's sales territory was assigned a workload value based on frequency of sales meetings and volume of sales to best reflect where the selling activities would occur within the territory.  (*Id.* at 1653, 2604.)  Based on this analysis, the workload center might not be the geographic center, since physicians may not be evenly spaced in the territory. (*Id.* at 167, 1679, 2705.)  The workload center is a reasonable measuring point between it and the salesperson's home.

ZS also considered the methodology of determining fifty miles.  ZS concluded the measuring distance is from an employee's principal residence by way of a straight line Earth-arc calculation ("as the crow flies") to the workload center.  To ZS, this was a uniform method that did not require consideration of an individual's driving preferences or rail alternatives.  The Plan Administrator adopted the "as the crow flies" recommendation uniformly.

Consequently, ZS analyzed the distance from the each employee's workload center to the

---

[4]      Plaintiffs dispute ZS's autonomy because ZS was retained by Abbott already with respect to the ongoing acquisition. (*Id.* at 68.)

employee's home. (*Id.*)   Often the distance between a Plaintiff's home to the workload center may be less than fifty miles as the crow flies, but the driving distance far exceeds fifty miles.   For example, under the Administrator's as the crow flies measurement, Mr. LaMartina's residence from (Long Island) is about 24 miles across Long Island Sound from his workload center in Yonkers; but the driving distance is 58 to 82 miles.[5] (See Opinion at p. 11-12).

**STANDARD OF REVIEW**

<u>**Summary Judgment**</u>

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact, and that the evidence establishes the movant's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   A genuine issue of fact exists only if a reasonable jury could return a verdict for the non-movant, and it is material only if it may affect the outcome of the suit based upon substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"   *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson*, 477 U.S. at 255).

After the movant has satisfied this burden, the non-moving party must establish that a genuine issue of material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103,

---

[5]      Finally, Plaintiffs take issue with changes in their employment responsibilities after the acquisition.  Prior to their employment with Abbott, Veltri, Mastropierro, Lamartina, and Betts were employed by Kos as territory managers and Bishop was employed by Kos as a district manager.  (*Id.* at 2703, 2618, 1678, 102, 165.)

1109 (3d Cir. 1985).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary

judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).  Rather, the non-

moving party must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R.

Civ. P. 56(e).  Moreover, only disputes over facts that might affect the outcome of the lawsuit under

governing law will preclude the entry of summary judgement.  *Anderson*, 477 U.S. at 247-48.

**ERISA Challenges to Employee Plans**

ERISA allows an individual denied benefits pursuant to an employee benefit plan to

challenge that denial in federal court.  29 U.S.C. § 1001 *et seq.*; 1132(a)(1)(B).  Generally,

"[c]onsistent with established principles of trust law . . .  a denial of benefits challenged under §

1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe

the terms of the plan."  *Firestone Tire and Rubber Co. v. Bruch*, 109 S.Ct. 948, 956-57 (1989).

Further, if a fiduciary acts on a discretionary basis but who is operating under a conflict of interest,

that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"

*Id.* (citing Restatement (Second) of Trusts § 187, comment d (1959)).   Under more recent cases,

trust law continues to apply a deferential standard of review to the discretionary decisionmaking of

a conflicted trustee, while at the same time requiring the reviewing judge to take account of the

conflict when determining whether the trustee, substantively or procedurally, has abused his

discretion."  *Metropolitan v. Glenn,* 128 S. Ct. 2343, 2350 (2008).

**DISCUSSION**

A conflict of interest exists in this case.  Abbott presently sponsors the Severance Plan.  The

Administrator is Abbott's Divisional Vice President of Employee and Labor Relations.  Claims paid

9

out under the Severance Plan are paid from Abbott's general assets.  The Supreme Court's analysis in the *Glenn* case controls here.  A conflict of interest is not and should not always be the determinative factor.  The Supreme Court in *Glenn* held that "[i]n principle, as we have said, conflicts are but one factor among many that a reviewing judge must take into account.  Benefits decisions arise in too many contexts, concern too many circumstances, and can relate in too many different ways to conflicts-which themselves vary in kind and in degree of seriousness-for us to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review."  *Id.* at 2351.  There is no bright line rule for judicial review. Each case must be decided on its facts. Whether the Plan Administrator abused its discretion necessitates a review of the specific circumstances on a case by case approach.  Generally the reviewing judge must take account of that circumstance as a factor in determining the ultimate adequacy of the record's support for the agency's own factual conclusion.  In so holding, the Court noted that it had not enunciated a precise standard; but it warned against creating formulas that will 'falsif[y] the actual process of judging' or serve as 'instrument[s] of futile casuistry.' . . . there 'are no talismanic words that can avoid the process of judgment.'" *Id.* (citing *Universal Camera Corp. v. NLRB*, 71 S.Ct. 456 (1951).

The Severance Plan's counsel has repeatedly emphasized throughout this case the importance of applying a "uniform methodology."  However, a uniform methodology does not always lead to reasonable conclusions nor insulate a plan administrator's decisions from appropriate factual review. The uniform approach of the Administrator is contrary to the Supreme Court's more measured approach in *Glenn*.  As the Supreme Court emphasized "there are no talismanic words that can avoid the process of judgment."  Hence, facts over precise formulas must be considered.

The Court fails to understand how (a) the Plan Administrator's interpretation of "eligible to

earn"; or (b) the distance of fifty miles as measured by as the crow flies method make sense or could achieve the type of fairness envisioned when the Severance Plan was established.

With regard to the "eligible to earn" calculation of salary, it is a hypothetical compensation figure not based on actual facts to determine if an employee suffered a decrease of more than a ten percent reduction in pay.  It is apparent that a good reason to quit would be an <u>actual</u> loss of more than ten percent.  This is not a complicated analysis.  It compares the salary earned prior to December 15, 2006 to the per annum salary at the time of resignation.  Here, the Administrator failed to consider the actual cash compensation received by the employees prior to December 15, 2006. The purpose of the Severance Plan is subverted when the Administrator adopts hypothetical formula instead of the actual circumstances faced by each employee.  For example, the circumstances surrounding Veltri's claim that her compensation was reduced by more than ten percent are particularly striking.  In 2006, immediately prior to the acquisition, Veltri alleges she earned $158,000.  At Abbott, she was to receive a total cash compensation of $ 100,925.  There is no dispute that this reduction exceeds ten percent.  However, the Severance Plan denied her benefits because the Administrator calculated she was only "eligible to earn" $105,527 on December 15, 2006 based upon the hypothetical target number. Determinations by the Adminstrator must be based on facts – not hypotheticals.  In applying *Glenn* and *Firestone* to these facts the Court finds the Administrator abused his discretion by not considering the actual compensation of the Plaintiffs.

Next, the Severance Plan adopted a "uniform methodology" of measuring 50 miles from the workload center to the salesperson's house. It used the "as the crow flies" method.  This approach on its face appears to be straightforward but the results are perplexing.  An examination of Lamartina's circumstances demonstrates the misguided nature of the Plan's "methodology."

11

Lamartina lives in Sayville, Long Island, New York. (AR at 1726.)  After the acquisition, Abbott required him to call upon doctors located in Connecticut and Yonkers, New York. (*Id.* at 1741-46.) Administering the "as the crow flies" uniform methodology, the newly assigned territory was  21.5 miles from his residence in Sayville, New York (*Id.* at 1726.)  The as the crow flies method fails to consider such facts as a substantial body of water, the Long Island Sound, which sits directly between Lamartina's residence and his workload center.[6]  A cursory examination of a map of the area would reveal this logistical difficulty.  While a crow may fly across the Long Island Sound to the workload center (about 21.5 miles), an individual cannot.  Lamartina argues that the shortest distance to any of the doctors assigned to him was 58.67 miles and the longest was 81.95 miles.  (*Id.*) It does not take an expert like ZS to evaluate that commute – it is intolerable on an everyday basis. While the "as the crow flies" method may be "uniform", it clearly is not reasonable in this circumstance.  It is a good reason to quit. The fifty mile distance must include some consideration of the time spent commuting.  Moreover, at oral argument the Severance Plan's counsel admitted to the Court that ZS never considered whether the Long Island Sound sat directly in the middle of Lamartina's commute.  As Abbott has repeatedly stated, the role of ZS and the Administrator was to adopt a "uniform" approach.  Nevertheless, uniformity does not always equate reasonableness.

---

[6]  Defendant cites to the Sixth Circuit's decision in *Senzarin v. Abbot Severance Pay Plan for Employees of Kos Pharmaceuticals,* which upheld the "as the crow flies" methodology as reasonable.  No. 08-4306, 2010 WL 114199 (6th Cir. Jan. 11, 2010).  While the Court in that case upheld the "as the crow flies" approach, it was limited to a single plaintiff and the facts are very distinguishable.  Moreover, the *Senzarin* Court conceded that facts similar to those before this Court may produce a different outcome.  The court noted that "This conclusion is limited to the facts of this case.  For example, if a participant employee serviced an area along the Mississippi River where there are limited crossing points, use of the straight-line earth-arc method might be arbitrary and capricious."  2010 WL 114199 at *4 n.4.  This exactly describes the factual circumstances presented to this court.  Thus, under these circumstances the application of "as the crow flies" was unreasonable.

As this Court understands the *Glenn* decision, more is required than simply uniformity – reasonableness is essential. Hence, the adoption of the "as the crow flies" measurement is unreasonable.   The Administrator must consider commuting time or other obstacles in his determination of what constitutes fifty miles.

Abbott additionally cites to the Third Circuit's recent decision in *Estate of Schwing v. The Lily Health Plan* to support its argument that the conflict of interest here should not be given much weight.  No. 06-4671, 2009 WL 989114 (Apr. 14, 2009).  In *Schwing*, the court upheld the administrator's decision that the plaintiff was ineligible for benefits because there was sufficient evidence on the record that the plaintiff's own misconduct led to his termination for cause.  The *Schwing* court remarked that the administrator had conducted an appropriate investigation of the claim.  *Id.* at *3.  Further, the court in discussing *Glenn*, cautioned that where a court reviews ERISA-governed plans "in another case, the facts may present an entirely different set of considerations." *Id.*  Finally, "[a]s *Glenn* recognized, benefits determinations arise in many different contexts and circumstances, and therefore, the factors to be considered will be varied and case-specific."  *Id.* (citing *Glenn*, 128 S.Ct. at 2351).  Here, as *Schwing* points out, there is an entirely different set of circumstances.

The Court's concern in this case is the Administrator's purposeful neglect of the many different contexts and circumstances involved in making benefits determinations.  Adopting uniform methodologies may be helpful and instructive, but they cannot be relied upon in every determination without conducting a review of the individual circumstances. An administrator's decision to deny benefits is inextricably linked to a review of the circumstances in each individual case.  When combined with Abbott's conflict of interest  the Court finds that the considerations weigh in favor

13

of remanding the determinations to the Administrator.

**CONCLUSION**

     The case is remanded to the Administrator for further review consistent with this Opinion.

The parties' cross-motions for summary judgment are denied.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

January 25, 2010

14