NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MICHELE VELTRI, JOHN MASTROPIERRO, CLAYTON BISHOP, JOHN LAMARTINA, AND DIANA BETTS, | Civil Action No. 08-00915 (PGS) |
| Plaintiffs, | |
| v. | **OPINION** |
| ABBOTT SEVERANCE PAY PLAN FOR EMPLOYEES OF KOS PHARMACEUTICALS, | |
| Defendants. | |

SHERIDAN, U.S.D.J.

This case comes before the Court on cross motions for summary judgment filed by Defendant, Abbott Severance Pay Plan For Employees of Kos Pharmaceuticals, and Plaintiffs, Michele Veltri ("Veltri"), John Mastropierro ("Mastropierro"), Clayton Bishop ("Bishop"), John Lamartina ("Lamartina"), and Diana Betts ("Betts") (collectively "Plaintiffs"). Plaintiffs initiated this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 et seq.

**BACKGROUND**

In connection with its acquisition of Kos Pharmaceuticals, Inc. on or about December 15, 2006, Abbott agreed to maintain and administer a severance plan for former Kos employees. On January 24, 2007, Abbott adopted the Kos Pharmaceuticals Change in Control Severance Plan and renamed it the Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals. By its

1

terms, the Plan was intended to provide a certain level of benefits to Kos employees if their employment terminated under certain specified circumstances before December 16, 2007. The Plan's Sponsor is Plaintiffs' former employer, Abbott Laboratories ("Abbott"). The Plan is administered by Abbott's Divisional Vice President, Employee and Labor  Relations (the "Plan Administrator").

I. Plan Eligibility

The Plan generally provides that if an eligible employee's employment is terminated without cause or the employee has "Good Reason" to resign, the employee is entitled to certain severance pay and benefits, including a lump sum cash severance payment, a prorated annual bonus for the year in which the employment termination occurs, and continued health and welfare benefits for a certain period of time.  Section IV.(a) of the Plan outlines the circumstances entitling a participant to certain pay and benefits if he or she incurs a "qualifying termination" and signs (and does not revoke) a Separation Agreement and Release.  In order to constitute a "qualifying termination," an employee must have been employed by Kos on December 15, 2006 and, prior to December 16, 2007, either: (1) be involuntarily terminated, other than for cause; or (2) voluntarily terminate employment for "Good Reason."  If a participant's employment is terminated for any reason other than those provided under Section IV.(a) of the Plan, the participant is not entitled to receive any of the pay and benefits described in the Plan.

Under the terms of the Plan, an employee who claims "Good Reason" for resigning must provide written notice that sets forth the specific conduct of the company the employee contends constitutes "Good Reason" under the terms of the Plan.  "Good Reason" is defined in the Plan as follows:

2

"Good Reason" means, with respect to any Participant and without such Participant's express written consent, the occurrence of any one or more of the following:

(i) a greater than 10% reduction of the Participant's annual base salary or any material reduction in the total cash compensation that the Participant is eligible to earn, from the level in effect immediately prior to December 15, 2006;

(ii) any demotion or other significant reduction in the job responsibilities held by the Participant immediately prior to December 15, 2006, or any significant change to the reporting relationship of the Participant as in effect immediately prior to December 15, 2006; or

(iii) any change of the Participant's principal place of employment to a location (i) in the case of Participants who are not sales personnel, 65 miles from the Participant's principal place of employment immediately prior to December 15, 2006, and (ii) in the case of Participants who are sales personnel, 50 miles from the Participant's principal residence immediately prior to December 15, 2006.

Under the Plan, the employee is required to give the company 30 days advance written notice of his or her intent to resign, with an explanation of the Good Reason.  The Plan says: "A termination of employment by the Participant for Good Reason for purposes of this Plan shall be effectuated by giving the Company written notice of termination setting forth in reasonable detail the specific conduct of the Company that constitutes Good Reason and the specific provisions of this Plan on which the participant relied."  (AR 5).  Elsewhere in the Plan, it states: "Your notice [of Good Reason] should be sent, or given to, Senior Manager, Employee Relations."  (AR 34).

II.  Interpretation of Plan Terms

The Plan states that the Plan Administrator "has the discretionary authority to interpret all Plan provisions and to determine all issues arising under the Plan, including issues of eligibility, coverage and benefits. . . .  The Plan Administrator may delegate its responsibilities under the Plan."

A.  <u>Material Reduction in Total Cash Compensation</u>

The term "material reduction in total cash compensation" was not defined under the Plan. The Plan determined that a "material" reduction in cash compensation would be a 10 percent reduction.  This was used as a "guidepost consistent with the stated 10% reduction in base salary" under the terms of the Plan.  The Plan Administrator claims to have established a methodology of determining each sales employee's total cash compensation and memorialized this methodology in a one-page document (the "Compensation Guidelines").  (AR 55-56).

According to the Compensation Guidelines, when a request for severance based on total compensation is under review, the following categories are considered: (1) the base salary that the employee earned prior to the change in the control and the base salary at the time of resignation are compared to assess any differences; and (2) the bonus earnings that an employee is eligible to earn prior to the change are assessed against the eligible bonus earnings at the time of the resignation.  Because the Plan premises "Good Reason" on "a greater than 10% reduction of the Participant's annual base salary or any material reduction in the total cash compensation that the Participant is eligible to earn," the relevant inquiry in the Compensation Guidelines was compensation an employee is "eligible" to earn, not compensation actually earned by the employee.  Accordingly, the following bonus categories were considered: (1) annual commission/ bonus target; (2) average SPIF payments (a recurring payment based on the attainment of specific criteria); and (3) any transition bonus.  The determination was based on a comparison of the Kos and Abbott compensation structures and an employee's eligible earnings prior to the change in control and at the time of the employee's resignation.  Additionally, the Compensation Guidelines reflected that stock equity was not included in the calculation because such equity is not cash compensation, as used in the Plan.

B. <u>Change In Principal Place Of Employment</u>

With respect to the Plan's definition of Good Reason as to "any change of the Participant's principal place of employment," there were different thresholds for two groups of employees.  For non-sales personnel, the employee's resignation is for Good Reason if there is "any change of the Participant's principal place of employment to a location . . . 65 miles from the Participant's principal place of employment immediately prior to December 15, 2006 . . . ."  For sales personnel, the employee resigns for Good Reason if the change to the principal place of employment is "50 miles from the Participant's principal residence immediately prior to December 15, 2006."

The Plan does not define the term "principal place of employment" or provide a method for calculating distance.  The Administrator and ZS Associates, an outside consultant, used a concept called "workload center" as the principal place of employment in determining distance from employees' principal residences.  The workload center was defined as the "weighted center of the workload based on the physicians in the geography."  Each physician in a particular employee's sales territory was assigned a workload value based on frequency of sales meetings and volume of sales to best reflect where the selling activities would occur within the territory.  Based on this analysis, the workload center might not be the geographic center, since physicians may not be evenly spaced in the territory. ZS and the Plan Administrator measured distance from an employee's principal residence by way of a straight line Earth-arc calculation ("as the crow flies").

ZS analyzed the distance from each employee's workload center to the center of his or her home zip code.  Using his discretion to interpret the Plan, the Administrator determined that the Plan language required that distance be measured from the employee's "principal residence,"

5

not his or her home zip code.  Therefore, the Administrator requested that ZS recalculate the distances for all sales personnel, including Plaintiffs.  ZS recalculated the distances from each employee's workload center to his or her residence.  For each calculation that it performed, ZS produced an individualized map showing the "dot density" (reflecting the workload in the territory and indicating where the pockets of high work concentration are located), the distance to the center of the employee's home zip code, and the distance to the employee's principal residence.

III.  The Claims Process

The Plan provides that any claim for benefits must be made in writing and submitted for consideration to the Committee.  If a claimant is not satisfied with the Committee's decision, he or she may request an appeal.  All appeals of an adverse decision by the Committee must be made in writing and addressed to the Plan Administrator, the Divisional Vice President, Employee and Labor Relations.  The Plan states that the Plan Administrator or its delegee "has the discretionary authority to interpret all Plan provisions and to determine all issues arising under the Plan, including issues of eligibility, coverage and benefits."  The Plan Administrator is charged with the task of making a full and fair review of the appeal and may review additional documents, if necessary, upon this review.  The decision of the Plan Administrator is considered final.  If a claimant is not satisfied with this decision, he or she may file a lawsuit in federal court under Section 502(a) of ERISA.

IV.  The Parties' Claims for Benefits and Appeals

Prior to their employment with Abbott, Plaintiffs, Michele Veltri ("Veltri"), John Mastropierro ("Mastropierro"), John LaMartina ("LaMartina"), and Diana Betts ("Betts")

6

(collectively "Plaintiffs") were employed by Kos Pharmaceuticals, Inc. ("Kos") as Territory

Managers and Clayton Bishop ("Bishop") was employed by Kos as a District Manager.  On or

about December 15, 2006, Abbott acquired Kos and its employees became employees of Abbott

or one of its subsidiaries.  Following the merger, Veltri, Mastropierro, LaMartina, and Betts

remained territory managers selling pharmaceutical products in their assigned territories.  Bishop

remained a district manager with responsibility for managing the performance of sales

representatives in his assigned district.  As a result of a sales force realignment, two of the

Plaintiffs were later reassigned to different geographic territories. All Plaintiffs' base salaries

remained the same, and they remained eligible for the Abbott bonus and commission plans.

     A.  <u>Veltri's Claim for Benefits and Appeal</u>

     On March 27, 2007, Veltri resigned by letter from her position with Abbott, stating that

she was doing so "for good cause under 'Good Reason' to Terminate Employment section" of

the Plan.  This letter constituted Veltri's claim for benefits under the Plan.  Veltri wrote:

> I believe I have been assigned a sales territory that:
>
> 1) Will afford me a material reduction in my total cash compensation
> 2) Significantly reduces my job responsibilities
>
> 3) Changes my principal place of employment more than 50 miles from my
> current home.

In support of her claim, Veltri stated that her actual commissions earned in 2006 was $35,000,

Abbott's commission schedule offered 10% less, and despite Abbott's 4% raise to her base

salary, the total cash compensation she was eligible to earn was reduced by more than 10%. She

also stated that the position offered by Abbott required her to work with primary care specialists,

not specialty physicians, and therefore her job responsibility was significantly reduced.  She

further stated that the majority of her business was located more than 50 miles from her home in Caldwell, New Jersey. Based on this submission, Veltri argued that she was eligible for benefits under the Plan.

Using the Compensation Guidelines, the Committee analyzed Veltri's total cash compensation and determined that she was eligible to earn a: (1) base salary; (2) target commission or target bonus; (3) target SPIF; and (4) target award under the Transition Pay Plan. When the Committee applied the compensation criteria outlined in the Compensation Guidelines, it determined that Veltri's total cash compensation was reduced by 4.4 percent. The Committee made the following findings regarding Veltri's total cash compensation:

|  | 12/14/2006 | Current |
|---|---|---|
| Base Salary | $73,925 | $73,925 |
| Commissions or Bonus | $30,852 | $19,500 |
| SPIF | $750 | $2,500 |
| Transition Pay Plan |  | $5,000 |
| Total Compensation | $105,527 | $100,925 |
| Reduction |  | 4.4% |

Accordingly, because her total cash compensation had not been reduced by 10 percent or more, according to the criteria in the Compensation Guidelines, the Committee concluded that Veltri did not resign for "Good Reason" under Section I.(o)(i) of the Plan and, therefore, was not entitled to Plan benefits.

The Committee also reviewed Veltri's job responsibilities prior to December 15, 2006 and found that Veltri's responsibilities were selling pharmaceutical products within her assigned territory. Starting February 28, 2007, Veltri's responsibilities were selling pharmaceutical products within her assigned territory, this time as part of the Primary Care sales force. The Committee noted that while Veltri's responsibilities had changed, they had not been reduced. The Committee concluded that because she had not been demoted and her job responsibilities

8

had not been significantly reduced, Veltri did not resign for "Good Reason" under Section I.(o)(ii) of the Plan and, therefore, was not entitled to benefits under the Plan.

Finally, the Committee also considered whether the position Abbott offered to Veltri was greater than 50 miles from her principal residence.  Using the analysis of Veltri's territory performed by ZS Associates, the Committee found that Veltri's workload center was 24.7 miles from the center of her home zip code and 25.2 miles from her principal residence. Although some of her assigned sales calls were more than 50 miles from her principal residence, under the definition established using ZS's analysis, this did not mean that there was a change in her workload center greater than 50 miles from her principal residence.  The Committee concluded that Veltri did not experience a change of more than 50 miles between her principal place of employment and her principal residence, and therefore, she did not resign for "Good Reason." As a result, the Committee concluded that Veltri was not entitled to benefits under this provision of the Plan.  By letter dated April 30, 2007, the Committee informed Veltri of its decision and its reasoning as well as her appeal rights.

Veltri appealed the Committee's decision as to compensation and job responsibility. She did not appeal the Committee's determination regarding the distance between her principal place of employment and her residence.  In her appeal letter, Veltri disagreed with the Committee's calculation of her total cash compensation.  Veltri argued that she was eligible to earn more money at Kos than the Plan considered.  Veltri asserted: "There is no better calculation of what an employee is eligible to earn than the employees [sic] actual earnings before the Change in Control Date."  Based on her interpretation, Veltri believed her total compensation for 2006 was $158,329.41, or 56.87% less than her projected earnings with Abbott in 2007.

Veltri further maintained that she was not in fact eligible to earn any SPIF payments in 2007 and that because the transition payment was a one-time payment only for those individuals employed as of December 14, 2007, it was a "sham."  Veltri contested the $19,500 target commission with Abbott, which she stated was "grossly inflated."

Veltri also disagreed with the Committee's determination that she had not been demoted. She argued that because she had been a cardiovascular sales specialist ("CSS") with Kos but offered a Lipid Sales Specialist ("LSS") position with Abbott, she had been demoted.  Veltri maintained that LSS employees were not permitted to call on specialists, which she had done with Kos.  Additionally, she characterized the CSS position as a "highly coveted" "specialty" sales force position and believed that it was "generally only provided to employees who have years of experience within the pharmaceutical industry and a strong sales background."  Because she believed she possessed those qualifications and viewed the LSS position as a "lower ranking" and "entry level position," she insisted she had been demoted.  Veltri cited to Abbott's CSS job opening description (which required some level of experience calling on specialty physicians).  She argued that "[t]he antonym of promotion is demotion."

Veltri also alleged in her appeal letter that "Abbott has refused requests for documentation" regarding certain topics, however there is no evidence in the Administrative Record that Veltri ever made a request for documentation or information.

The Plan Administrator reviewed Veltri's appeal as well as the initial claim denial by the Committee and determined that she did not have Good Reason when she voluntarily terminated her employment.  Accordingly, the Plan Administrator upheld the Committee's decision denying benefits, and on August 10, 2007, the Plan Administrator sent Plaintiff a letter denying her appeal.

The Plan Administrator concluded that "Good Reason," as used in the plan, focused on eligible earnings, not "actual earnings," and therefore the Committee appropriately looked at target compensation rather than compensation actually received in 2006.  The Administrator stated his agreement with the Committee that Veltri's total cash compensation had been properly calculated and resulted in only a 4.4% reduction.  Because Veltri did not experience a 10% reduction in base salary or a material reduction in total cash compensation, the claims fiduciary determined that she did not resign for "Good Reason" and was not entitled to severance benefits under the Plan.

The Plan Administrator next addressed Veltri's claim that she had been demoted and/or had her job responsibilities significantly reduced.  He stated that her job responsibilities had changed but that did not constitute a demotion and her responsibilities had not been reduced. The Plan Administrator noted that while he recognized Veltri's perception "that calling on Specialists is a higher-level responsibility than calling on Primary Care Physicians, in reality [her] level of job responsibility, reporting structure and salary remained unchanged."  Therefore, the Plan Administrator determined that the Committee's decision should be upheld on appeal. The Administrator's determination with respect to Veltri's job responsibilities was consistent with what sales personnel had been told in a February 23, 2007 presentation by Abbott.  During that presentation, Abbott explained that "Kos' territory managers are the equivalent of sales specialists in our new organization" and displayed a chart reflecting that the job scope of both Kos territory managers and Abbott sales specialists were the same.

B.  Mastropierro's Claim for Benefits and Appeal

On March 9, 2007, Mastropierro informed Abbott of his "intent to terminate [his] employment with good cause."  The letter he submitted constituted Mastropierro's claim for

benefits under the Plan.  In his letter, Mastropierro asserted that he was terminating his employment for Good Reason under the terms of the Plan under the "eligible to earn" clause. Specifically, Mastropierro stated that in 2006 he earned $86,000 in base salary and $90,000 in commissions.  While he acknowledged that his base salary would remain unchanged with Abbott, he argued that he would only be eligible to earn between $3,000 and $10,000 in commissions every trimester, which was less than the average $7,500 he earned monthly with Kos.  Because he maintained that at Abbott he would only be eligible to earn a maximum of $131,000, he believed his total compensation would be reduced by over 10%.  Mastropierro admitted in his letter that he had been informed by a member of Abbott's Human Resources that Abbott included target bonuses and commissions as well as SPIF payments in calculating his cash compensation.  However, Mastropierro asserted that this was "inconsistent with the Severance Plan," and that he was nevertheless eligible for benefits under the Plan based upon the amount he was eligible to earn at Kos.

The Committee analyzed Mastropierro's total cash compensation based on methodology outlined in the Compensation Guidelines and determined that he was eligible to earn a: (1) base salary; (2) target commission or target bonus; (3) target SPIF; and (4) target award under the Transition Pay Plan.  The Committee then concluded that Mastropierro's total cash compensation was reduced by 6.1%.  Specifically, the Committee made the following findings regarding Mastropierro's total cash compensation:

|  | 12/14/2006 | Current |
|---|---|---|
| Base Salary | $86,230 | $86,230 |
| Commissions or Bonus | $30,852 | $21,900 |
| SPIF | $750 | $2,500 |
| Transition Pay Plan |  |  |
| Total Compensation | $117,832 | $110,630 |
| Reduction |  | 6.1% |

Accordingly, the Committee concluded that Mastropierro had not experienced a greater than 10% reduction in his total cash compensation and therefore he did not have "Good Reason" to terminate his employment under Section I.(o)(i) of the Plan.  Therefore, the Committee found Mastropierro was not entitled to benefits under the Plan.  By letter dated April 30, 2007, the Committee informed Mastropierro of its decision and its reasoning, as well as his rights to appeal this decision.

On June 6, 2007, Mastropierro's attorney sent a letter to the Administrator requesting certain information.  On June 27, 2007, the Plan Administrator responded to Mastropierro's attorney regarding his request for information by producing a copy of the Plan and Summary Plan Description.

By letter dated June 28, 2007, Mastropierro appealed the Committee's decision.  In his appeal letter, Mastropierro disagreed with the Committee's calculation of his total cash compensation because he believed he was "eligible to earn" more at Kos than was considered by the Plan.  He argued that in 2006 he earned $90,138 in commissions and using his actual 2006 earnings, he experienced a 60.1% reduction in pay in comparison to Abbott's 2007 projected earnings.  According to Mastropierro, "[t]here is no better calculation of what an employee is eligible to earn than the employees [sic] actual earnings before the Change in Control Date."  Therefore, Mastropierro contended that Abbott's decision to use target earnings rather than actual earnings prior to December 15, 2006 was arbitrary and capricious, and that he was eligible to earn more at Kos than the Plan considered.  In support of his position, Mastropierro attached his 2004, 2005, and 2006 W2 Statements, along with the September 2006 rankings from Kos, and other documents.  Mastropierro further objected to Abbott's failure to account for the stock

and stock options he earned prior to December 15, 2006, and he argued that he was not really eligible to earn any SPIF payments in 2007.  Finally, Mastropierro complained that he had not been provided certain documentation or received any response to his request for information.

The Plan Administrator reviewed Mastropierro's appeal and the initial claim denial by the Committee.  The Plan Administrator wrote that "[s]ection I(o)(i) of the Plan states that any material reduction is based upon total cash compensation eligible to earn, not based upon past actual earnings."  As a result, the Plan Administrator found that Mastropierro's submission of his earnings data from 2004, 2005, and 2006 was not relevant to the determination of Good Reason and further concluded that the Committee had correctly used bonus targets to determine the amount Mastropierro was eligible to earn.  Additionally, the Plan Administrator noted that "non-cash compensation, including stock options and restricted stock," were not included in the analysis because they constitute non-cash compensation and the Plan specifically refers to "total cash compensation."

The Plan Administrator, based on his review of the record, agreed with the Committee that Mastropierro's total cash compensation had been properly calculated and resulted in only a 6.1% reduction.  The Plan Administrator upheld the Committee's determination of Mastropierro's claim for benefits.  On August 10, 2007, the Plan Administrator sent Mastropierro a letter denying his appeal.

C.  Bishop's Claim for Benefits and Appeal

On March 24, 2007, Bishop resigned his position with Abbott, alleging he was doing so for Good Reason under the terms of the Plan.  On March 27, 2007, he submitted a revised resignation letter with additional information regarding earnings and geography.  This letter constituted Bishop's claim for benefits under the Plan.  Bishop contended he had Good Reason

for voluntarily terminating his employment because: (1) he expected he would experience a greater than 10% reduction of the total cash compensation he was eligible to earn; (2) he believed his new position "represent[ed] a significant demotion in the job responsibilities;" and (3) his principal place of employment was more than 50 miles from his residence.  In support of his claim, Bishop provided actual earnings information from 2003, 2004, 2005, and 2006 as well as maps of his district and Mapquest documents.  Bishop also listed differences between his former position with Kos and his new position with Abbott.  Bishop requested benefits under the Plan on the basis of these arguments.

In response, the Committee explained its methodology for analyzing compensation-based claims for benefits.  Using the Compensation Guidelines, the Committee analyzed Bishop's total cash compensation and determined that he was eligible to earn: (1) base salary; (2) target commission or target bonus; (3) target SPIF; and (4) target award under the Transition Pay Plan. Based on this compensation criteria, the Committee determined that Bishop's total cash compensation was reduced by only 4.6 percent.

The Committee made the following findings regarding Bishop's total cash compensation:

|  | 12/14/2006 | Current |
|---|---|---|
| Base Salary | $107,957 | $107,957 |
| Commissions or Bonus | $46,278 | $31,200 |
| SPIF |  | $8,000 |
| Transition Pay Plan |  |  |
| Total Compensation | $154,235 | $147,157 |
| Reduction |  | 4.6% |

Because the Committee concluded that Bishop's total cash compensation was not reduced by 10 percent or more, it found he had not resigned for "Good Reason" under Section I.(o)(i) of the Plan and, therefore, was not entitled to benefits under the Plan.

The Committee also analyzed whether the position Abbott offered to Bishop was greater than 50 miles from his home.  As explained in the Committee's letter, the Administrator had interpreted the term "principal place of employment," which was undefined in the Plan, to mean workload center (the weighted center of the workload based on the physicians in the geography). Using that interpretation, the Committee found that Bishop's workload center did not change to more than 50 miles from his principal residence but rather was only 26.1 miles from his residence.  While some of his assigned sales calls were more than 50 miles from his principal residence, the Committee said that this did not mean that there was a change in his workload center greater than 50 miles from his principal residence.  As a result, the Committee determined that Bishop did not resign for "Good Reason" and thus was not entitled to benefits under this provision of the Plan. The Committee informed Bishop of its decision, its reasoning, and Bishop's appeal rights by letter dated April 30, 2007.

In an undated letter to the Administrator, Bishop requested certain information. On June 6, 2007, Bishop's attorney sent a letter to the Administrator requesting the same information outlined in Bishop's undated letter as well as additional information.  Bishop's attorney sent the Administrator his letter request along with a cover letter stating that he represented Bishop and was enclosing a request for certain information.  On June 27, 2007, the Plan Administrator responded to Bishop's attorney regarding his request for information by producing a copy of the Plan and Summary Plan Description.  The Administrator attached a copy of the Plan and the Summary Plan Description to his June 27 response letter.

Bishop appealed the Committee's decision.  In his appeal letter, Bishop took issue with the Committee's calculation of the amount he was eligible to earn at Kos.  According to Bishop, Abbott's method of calculating his 2006 earnings was arbitrary and capricious because the

16

amount he was eligible to earn at Kos was the cash compensation he was paid at Kos.  Bishop argued "There is no better calculation of what an employee is eligible to earn than the employees [sic] actual earnings before the Change in Control Date."  Bishop also contested Abbott's inclusion of the transition payment in his 2007 projected earnings because he maintained that the transition payment was a "sham" one-time payment only for those individuals employed as of December 14, 2007.  Removing the transition payment, Bishop calculated the reduction in his total compensation as 10.84%.

Bishop further challenged the determination that his residence was 26.1 miles from his workload center.  He argued, in part based on internet-based mapping programs, that the shortest distance between his home and his territory averaged around 90 miles.  Bishop also stated that he had not been provided certain documentation or received any response to an earlier request for information.  He also argued that the district manager position he was offered with Abbott was "not equivalent" to the district manager position he had with Kos.

The Plan Administrator reviewed Bishop's appeal and the initial claim denial by the Committee, and he determined that Bishop did not have Good Reason when he voluntarily terminated his employment.  Accordingly, in a letter dated August 3, 2007, the Plan Administrator upheld the Committee's decision denying benefits.

The PlanAdministrator determined agreed with the Committee that Bishop's total cash compensation had been properly calculated and resulted in only a 4.6% reduction.  The Administrator determined that Bishop did not resign for "Good Reason" and was not entitled to severance benefits under the Plan.

The Plan Administrator explained that because the Plan did not define "principal place of employment" and did not provide a method of calculating distance from an employee's principal

17

residence, he had exercised his discretion to interpret Plan terms and retained a consultant. Using workload center and calculating distance as the crow flies, the Plan Administrator found that Bishop's residence was 25.7 miles from his workload center and thus he agreed with the Committee's determination that Bishop's principal place of employment was not more than 50 miles from his residence.  The Plan Administrator determined that Bishop had not terminated his employment for Good Reason and therefore he was not entitled to benefits under the Plan. The Administrator attached to the appeal denial letter a document explaining the ZS Associates methodology along with a map showing Bishop's territory, workload center, and principal residence.

    D.  LaMartina

        The facts involved in LaMartina's claim are slightly more complicated than the facts forming the basis of the other plaintiffs' claims.  LaMartina, who lived in Long Island, New York, was first assigned a sales position in the Yonkers, New York territory.  He received the assignment on February 28, 2007.  He calculated the distances to the various doctors in his territory, which extended into Connecticut, and determined the average to be over 50 miles driving distance from his residence.  Although it is not completely clear, the record reflects that soon after receiving his assignment, if not that same day, LaMartina made it known to his employer, Abbott, that he disputed the distance calculation, that the average distance between his principal place of residence to the doctors in his new territory was over 50 miles, and that he therefore deserved severance.

        It seems that, when faced with LaMartina's assertion that his new territory was over 50 miles from his residence and that accordingly he was entitled to benefits, instead of telling LaMartina how to "officially" request consideration for severance benefits, which Abbott did six

days later on March 7, Abbott spent six days telling LaMartina he was wrong about the distance between his home and the Yonkers territory.  Then, the record reflects that on March 6, Abbott offered LaMartina a different, and at that time unspecified territory that Abbott said was, like the first territory, also within 50 miles of LaMartina's home.  LaMartina then immediately emailed his employer and expressed his desire to take severance.

LaMartina's March 6 request for severance was sent first to Abbott employee Jerry Shuck and then eventually to Kristin Slattery.  Slattery emailed LaMartina on March 7, expressing the company's position that he was ineligible for severance based on distance. Slattery also told LaMartina that "to officially request consideration for severance benefits," he needed to submit, by email to Slattery with a copy to LaMartina's District Manager, "a letter of resignation citing 'good reason', as required by the severance plan, with an explanation of why you feel you are eligible for severance benefits."

On the same day, March 7, and within six hours of Slattery's email, LaMartina sent an email in response citing "Good Reason".  He wrote that the original territory offered to him was greater than 50 miles away from his home, and cited the Long Island Sound as an obstacle that prevented him from reaching any of the locations in the territory without driving greater than 50 miles.  He also wrote that he originally requested the severance benefits based on the territory assignment on February 29, i.e., the day after the territory was assigned to him.  He wrote:

> [n]ow 6 days later a new territory has come to light that is closer to my home.  If my original territory was truly within the 50 mile radius then why the new territory 6 days after I requested severance?  Problem here is no one answered my initial option.

(AR 1669).

On March 7, 2007, LaMartina submitted a claim for benefits, stating that he was doing so for Good Reason because the Yonkers, New York territory Abbott offered him was greater than

19

50 miles from his home.  In support of his claim, LaMartina stated that based on the driving route he utilized, his new territory was more than 50 miles from his home, and thus he argued that he was eligible for benefits under the Plan.

Using the same methodology formulated by the consultant, the Committee considered whether the position Abbott offered to LaMartina was greater than 50 miles from his home.  The Committee found that LaMartina's workload center was only 21.5 miles from his principal residence.  Accordingly, the Committee concluded that LaMartina did not resign for "Good Reason" and, therefore, was not entitled to benefits under this provision of the Plan.  By letter, the Committee informed LaMartina of its decision, its reasoning, and LaMartina's appeal rights.

On June 6, 2007, LaMartina's attorney sent a letter to the Administrator requesting certain information.  LaMartina's attorney sent the Administrator his letter request along with a cover letter stating that he represented LaMartina and was enclosing an information request.  On June 27, 2007, the Plan Administrator responded to LaMartina's attorney regarding his request for information by sending a copy of the Plan and the Summary Plan Description.

LaMartina appealed the Committee's decision.  In his appeal letter, LaMartina wrote that he had not been provided certain documentation or received any response to his request for information.  Substantively, he submitted driving routes as the proper method of calculating distance and asserted that his home was located between 58.67 and 81.95 miles from the physicians he would be required to visit in his position with Abbott.  LaMartina attached a spreadsheet, Mapquest directions, and Mapquest maps to his appeal.  Based on his calculations, LaMartina concluded that "the average number of miles between each physicians [sic] offices and [his] residential home address is 70.31 miles," and therefore, LaMartina believed that he had resigned for Good Reason.

20

The Plan Administrator reviewed LaMartina's appeal as well as the initial claim denial by the Committee and determined that he did not have Good Reason when he voluntarily terminated his employment.  The Plan Administrator explained that because the Plan did not define "principal place of employment" and did not provide a method of calculating distance from an employee's principal residence, a methodology was developed and applying it to LaMartina's case, the Administrator agreed with the Committee's determination that LaMartina's principal place of employment was not more than 50 miles from his residence.  The Administrator noted that the Committee had utilized the methodology described *supra* to determine that LaMartina's residence was only 21.5 miles from his principal place of employment (the Glen Cove Territory) and that LaMartina had not submitted any information demonstrating the Committee incorrectly identified his principal residence or principal place of employment.  The Administrator determined that because LaMartina's principal place of employment was not more than 50 miles from his principal residence at the time of his voluntary resignation, he had not terminated his employment for Good Reason and therefore he was not entitled to benefits under the Plan.

The letter from the Plan Administrator said, in part:

On February 28, 2007 . . . you were assigned a Sales position in the Glen Cove, NY territory. . . .  [You] requested a benefit on the basis that you had "good reason" on the date of your termination of employment because your principal place of employment was changed to a location that is more than 50 miles from your principal residence immediately prior to December 15, 2006. . . .  [T]he Committee determined that your initial new principal place of employment in the Glen Cove, NY territory was only 21.5 miles from your principal residence. . . .  [I] agree with the Committee's determination that your principal place of employment at the time you terminated employment was not more than 50 miles from your principal residence immediately before December 15, 2006.

(AR 2605).  The Administrator attached to the appeal denial letter a document explaining the ZS Associates methodology along with a map showing LaMartina's territory, workload center, and principal residence.  Accordingly, the Plan Administrator upheld the Committee's decision denying benefits and informed LaMartina of that decision by letter dated August 3, 2007.

By letter dated March 18, 2007, Betts notified Abbott that she was resigning for Good Reason.  In this letter, which constituted her claim for benefits under the Plan, Betts informed Abbott that she had Good Reason because the amount she was eligible to earn at Abbott compared to what she was eligible to earn at Kos would be reduced by more than 10%.  Betts calculated her actual salary and commissions for 2006 as $114,969 and estimated that she would be eligible to earn only $95,000 in salary and commissions at Abbott.  On the basis of these two numbers, Betts maintained that she would experience a 17% reduction in her actual cash income. Betts also proffered several reasons why she did not believe she would reach the $95,000 in salary and commissions with Abbott.

Relying on the Compensation Guidelines, the Committee analyzed Betts' total cash compensation based on this uniform method and determined that she was eligible to earn a: (1) base salary; (2) target commission or target bonus; (3) target SPIF; and (4) target award under the Transition Pay Plan.  The Committee then concluded that Betts' total cash compensation was reduced by 6.7% as shown in the following chart, which was included in the Committee's letter to Betts:

|  | 12/14/2006 | Current |
|---|---|---|
| Base Salary | $68,448 | $68,448 |
| Commissions or Bonus | $30,852 | $22,650 |
| SPIF | $750 | $2,250 |
| Transition Pay Plan |  |  |
| Total Compensation | $100,050 | $93,348 |
| Reduction |  | 6.7% |

22

Because it found that Betts had not experienced a greater than 10% reduction in her total cash compensation, the Committee concluded that she did not have "Good Reason" under Section I.(o)(i) of the Plan to terminate her employment.  As a result, the Committee denied Betts' claim for benefits under the Plan and informed her of that decision, its reasoning, and Betts' appeal rights by letter dated April 30, 2007.

By letter dated June 27, 2007, Betts appealed the Committee's decision.  In her appeal letter, Betts disagreed with the Committee's method of calculating her total cash compensation because the Committee had used target compensation.  She stated in her letter that "Abbott has refused requests for documentation" regarding particular topics, although there is no evidence in the Administrative Record that Betts ever made such a request.  Betts believed that "[t]here is no better calculation of what an employee is eligible to earn than the employees [sic] actual earnings before the Change in Control Date."  In comparing her actual 2006 earnings of $160,993 to the target compensation identified by Abbott, Betts concluded she would experience a 72.46% reduction in total compensation.  Additionally, although she specifically did not take stock grants and other awards into consideration in her original claim for benefits so as to offset the SPIF payments she also did not consider, Betts argued in her appeal that the Committee's failure to account for the stock options and stock distributions she received at Kos was incorrect.  Betts further maintained that she was not really eligible to earn any SPIF payments in 2007, and that the $19,500 in target commissions identified by the Committee was "grossly inflated."  The Committee's letter of April 30, 2007 had indicated that Betts was eligible to earn a target commission or bonus of $22,650.

The Plan Administrator reviewed Betts' appeal as well as the initial claim denial by the Committee. The Plan Administrator determined that "[s]ection I(o)(i) of the Plan states that any material reduction is based upon total cash compensation eligible to earn, not based upon past actual earnings." As a result, the Plan Administrator found that Betts' submission of her 2006 W-2 was not relevant to the determination of Good Reason and further concluded that the Committee had correctly used bonus targets as the method of calculating the amount Betts was eligible to earn. After reviewing the appeal, the Plan Administrator agreed with the Committee in concluding that Betts would experience only a 6.7% reduction in total cash compensation. Because Betts did not experience a 10% reduction in base salary or a material reduction in total cash compensation, the Administrator decided that she did not resign for "Good Reason" and was not entitled to severance benefits under the Plan. Accordingly, the Plan Administrator upheld the Committee's determination of Betts' claim for benefits. On August 3, 2007, the Plan Administrator sent Betts a letter denying her appeal.

V. Prior Proceedings in This Court

Plaintiffs filed a complaint in federal court challenging the denial of their claims for severance benefits, subsequently filing their first amended complaint on February 22, 2008. ECF. No. 1. The Plan answered the first amended complaint on June 5, 2008. ECF. No. 27. On March 18, 2009, Plaintiffs and the Plan filed cross motions for summary judgment. ECF. Nos. 41-44. On April 1, 2009, Plaintiffs filed an opposition to the Plan's motion for summary judgment. ECF. No. 45. On that same date, the Plan filed an opposition to Plaintiffs' motion for summary judgment. ECF. No. 46. On April 8, 2009, Plaintiffs and the Plan filed replies in support of their respective dispositive motions. ECF. Nos. 47, 48. On January 25, 2010, the Court denied cross motions for summary judgment and remanded the claims to the Administrator

24

for further review consistent with its opinion.  ECF. Nos. 57 and 58.  With respect to the compensation claims, the Court found that the Plan Administrator should have considered the actual compensation earned by the claimants in 2006.  *Id.* at 11.  Regarding distance, the Court discussed LaMartina's distance claim and found that the Plan Administrator should have considered commuting time or other obstacles in determining what constituted 50 miles.  *Id.* at 11-13.

VI.  The Administrator's Reconsideration of the Remanded Claims

On August 30, 2010, Plaintiffs submitted to the Plan Administrator additional information in support of their claims on remand.  Specifically, each Plaintiff submitted a declaration stating the reason(s) he or she believed the Plan Administrator should grant him or her benefits.  Each Plaintiff attached portions of the Administrative Record to his or her declaration.  Additionally, counsel for Plaintiffs enclosed a copy of the original Kos severance plan and asserted Plaintiffs' position that "the addition of discretionary authority to interpret the Plan is an adverse change in the provisions of the Agreement."

On March 11, 2011, the Plan Administrator denied Plaintiffs' claims on remand.  The Plan Administrator acknowledged receipt of Plaintiffs' submissions, but clarified the scope of review as limited to the issues remanded by the Court in its January 25, 2010 summary judgment opinion and order.  Specifically, the Plan Administrator stated the issues remanded for his review were: "(1) the method of calculating claims based on an alleged 'material reduction in the total cash compensation that the Participant is eligible to earn;' and (2) the method of calculating Mr. LaMartina's distance to his new workload center given the location of Long Island Sound." Given the scope of review, the Plan Administrator stated that he had not reconsidered any other aspect of the prior claims process raised by the claimants in the remand process.  In addition, the

25

Plan Administrator stated that he had not considered any new claims raised by Plaintiffs for the first time in their remand declarations.  For example, LaMartina suggested in his declaration that he experienced a demotion, but that claim was not a part of the original claims process. Similarly, the Administrator noted that Plaintiffs' assertion "that the addition of discretionary authority to interpret the Plan is an adverse change to the provisions of the Agreement" was not previously asserted during any portion of the claims process and, therefore, did not fall within the narrow scope of issues to be considered pursuant to the Court's remand.

With respect to the compensation claims, the Administrator acknowledged the Court's concern that the Administrator had not previously considered whether Plaintiffs Veltri, Mastropierro, Bishop, and Betts experienced "an actual loss of more than ten percent."  The Plan Administrator, therefore, stated that he compared Plaintiffs' actual 2006 Kos compensation to the actual cash compensation of similarly situated employees who continued to work throughout the entire year of 2007 in the (1) sales districts to which Veltri, Betts, and Mastropierro were assigned before they resigned and the (2) sales region to which Bishop was assigned before he resigned.  To accomplish this analysis, the Plan Administrator obtained the average commissions and SPIFF bonus earnings for other employees in the same district (for Veltri, Betts, and Mastopierro) or region (for Bishop) and utilized that average actual cash earnings in evaluating whether they experienced a "material reduction in the total cash compensation" that they were eligible to earn at Abbott.  In identifying average cash earnings of peers in Veltri, Betts and Mastropierro's district and Bishop's region, the Administrator did not consider incentive compensation for any employee who worked only a partial year in 2007 at Abbott.

The Plan Administrator noted that, in its view, Plaintiffs had submitted some incomplete information concerning the commissions they claimed to have earned in 2006.  (AR 2824-2825

26

at n.5).  Accordingly, the Plan Administrator stated that it used the information Abbott had in its possession concerning Plaintiffs' 2006 commissions.  *Id.*  The Plan Administrator attached copies of the commissions information upon which he purportedly relied, and tendered to Plaintiffs the compensation information that he used to conduct this analysis.  (AR 2824; 2824-2825 at n.5; 2840-2841 at Exhibit C; AR 2842-2843 at Exhibit D).

Using this alternate analysis, the Plan Administrator made the following compensation calculation for Veltri:

|  | 2006 Kos Actual | Abbott 2007 |
|---|---|---|
| Base Salary | $73,925 | $73,925 |
| Commissions or Bonus | $31,475 | $14,983.95 |
| SPIF | $750 | |
| Transition Pay Plan | | $5,000 |
| Total Compensation | $106,150 | $93,908.95 |
| Difference | | -$12,241.05 |
| Reduction | | 11.5% |

Using this alternate analysis, the Plan Administrator made the following compensation calculation for Mastropierro:

|  | 2006 Kos Actual | Abbott 2007 |
|---|---|---|
| Base Salary | $86,230 | $86,230 |
| Commissions or Bonus | $75,556 | $27,866.54 |
| SPIF | $750 | |
| Transition Pay Plan | | |
| Total Compensation | $162,536 | $114,096.54 |
| Difference | | -$48,439.46 |
| Reduction | | 29.8% |

Using this alternate analysis, the Plan Administrator made the following compensation calculation for Bishop:

|  | 2006 Kos Actual | Abbott 2007 |
|---|---|---|
| Base Salary | $107,957 | $107,957 |
| Commissions or Bonus | $49,122 | $67,073.36 |

| | | |
|---|---|---|
| SPIF | | |
| Transition Pay Plan | | $8,000 |
| Total Compensation | $157,059 | $183,030.36 |
| Difference | | +$25,951.36 |
| Reduction | | +16.5% |

Using this alternate analysis, the Plan Administrator made the following compensation

calculation for Betts:

| | 2006 Kos Actual | Abbott 2007 |
|---|---|---|
| Base Salary | $68,448 | $68,448 |
| Commissions or Bonus | $32,468 | $11,419.12 |
| SPIF | $750 | |
| Transition Pay Plan | | $8,000 |
| Total Compensation | $101,666 | $79,867.12 |
| Difference | | -$21,798.88 |
| Reduction | | 21.4% |

   Based on the calculations, *supra*, the Plan Administrator noted that under the alternate

analysis applied on remand, Veltri, Mastropierro, and Betts would have experienced a material

reduction in the total cash compensation they were eligible to earn at Abbott and their claims for

severance benefits would be granted.  However, the Plan Administrator also noted that even

under the alternate analysis ordered by the Court, Bishop would not qualify for benefits because

he did not experience a greater than 10% reduction in the total cash compensation he was eligible

to earn at Abbott.  As a result, Bishop's claim would again be denied even under the alternate

analysis.  The Plan Administrator informed Plaintiffs that the Plan continued to maintain that its

original analysis of their compensation claims was fully consistent with the terms of the Plan.

   With respect to LaMartina's distance claim, the Plan Administrator noted that the Court

had ordered him to consider obstacles like the location of the Long Island Sound.  The Plan

Administrator recognized that LaMartina was originally assigned a territory on one side of Long

Island Sound, while LaMartina's was located on the other side of that body of water.  The

Administrator attached a map showing the territory LaMartina was originally offered (Yonkers Territory no. 37321).  The Plan Administrator noted, however, that its view of the facts was that before LaMartina resigned on March 7, 2007, he was offered a different territory that was on the same side of the Long Island Sound as his residence.  The Plan Administrator attached a map showing the second territory offered to LaMartina (Glen Cove, NY Territory no. 3444).  The Administrator clarified that as indicated in his prior denial of LaMartina's distance claim, the distance calculation between LaMartina's principal residence and the Glen Cove Territory was 21.5 miles.  Accordingly, because the distance was less than 50 miles and because LaMartina's principal residence and his "principal place of employment" were on the same side of the Long Island Sound, the Plan Administrator found that LaMartina was still ineligible for benefits under the terms of the Plan.

The Plan Administrator acknowledged that LaMartina asserted on remand that he resigned before he was offered the second territory on his side of the Long Island Sound. Indeed, in a declaration submitted to the Administrator after the claims were remanded, LaMartina wrote that he resigned on February 28, 2006, and that "after I resigned, Abbott tried to get me to change my mind by changing my sales territory to a territory they claimed was within 50 miles of my home."  He wrote he had already resigned at the time the offer was made.

But the Plan Administrator found this argument contrary to the record.  Specifically, the Plan Administrator found that LaMartina had been offered the Glen Cove Territory on March 6, 2007, the same day that he sent an e-mail, expressing concern about the distance of his new territory, but specifically stating "I am not resigning but exercising the option to opt out."  The Plan Administrator found that it was not until March 7, 2007 that LaMartina submitted his official letter of resignation and requested benefits.  Accordingly, the Administrator denied

LaMartina's claim, finding that he did not experience a change in the principal place of employment that was more than 50 miles from his principal residence.

On May 5, 2011, Plaintiffs appealed the denial of their claims on remand, stating through their counsel that they relied on previously submitted materials and the administrative record previously developed.  On May 13, 2011, the Plan Administrator requested confirmation that Plaintiffs did not intend to submit additional information in support of their appeals and further, that LaMartina (who was not referenced in the May 5 appeal letter) was also appealing the denial of his claim on remand.  On May 14, 2011, Plaintiffs' counsel responded that LaMartina was appealing the denial of his claim on remand and that in support of their appeal, Plaintiffs relied on "the record as it has been developed in their prior submissions, argument, and decision of Judge Sheridan."

On January 4, 2012, the Plan Administrator denied Plaintiffs' appeal, noting that Plaintiffs "have provided no additional information or argument in support of their appeal. Accordingly, my prior denial stands."  The Plan Administrator also noted that the appeal denial letter inadvertently had not been sent earlier in 2011, for which he apologized.

## DISCUSSION

I.  <u>Legal Standards</u>

    A.  <u>Summary Judgment Standard</u>

The standard for a motion for summary judgment is well-settled and will be briefly summarized here. Rule 56 provides that summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor." *United States*

*ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009) (citing *Abramson v. William Paterson Coll.*, 260 F.3d 265, 276 (3d Cir. 2001)).

 B. ERISA Plan Benefits Standard of Review

 ERISA permits a plan participant or beneficiary to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  The Court should review a denial of ERISA plan benefits under a de novo standard of review, unless the benefit plan gives the administrator or fiduciary of the plan discretionary authority to determine benefits eligibility or construe the plan's terms. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). If the plan confers such discretion, as the Plan does here, the Court should apply a deferential abuse of discretion standard.[1]  *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525, 526 n.2 (3d Cir. 2009).[2]  Under this

---

[1] It should be noted that Plaintiffs argued on remand to the Administrator, and for the first time, that the abuse of discretion standard should not apply.  Plaintiffs' reasoning was that in a document entitled "Kos Pharmaceuticals Change In Control Severance Plan," (AR 2804) Abbott was not vested with discretionary authority to interpret the Plan, and the document prohibited amending the plan in any manner that is adverse to a participant without the written consent of the participant.  (AR 2754; AR 2813-2814).  Therefore, Plaintiffs argue that because the only way to amend the Plan is for affected participants to consent to the change, and because there is no evidence that the Plan obtained the consent of the affected participants, the amendment is not effective and review is de novo.  See Pl. Br. at 32 (citing *Confer v. Custom Engineering Co.*, 952 F.2d 41, 43 (3d Cir. 1991)). Here, however, the Plan considered by the Administrator and the Court before remand undoubtedly gives the Administrator the unqualified discretion to determine eligibility for benefits, and Plaintiffs previously admitted as much.  *See, e.g.*, ECF No. 42 at 5.  In addition, the Court previously found that the Plan provides the Administrator with discretionary authority to interpret Plan terms.  ECF No. 57 at 4.  Barring extraordinary circumstances, "litigants should not be permitted to relitigate issues that they have already had a fair opportunity to contest. *Cowgill v. Raymark Industries, Inc.*, 832 F.2d 798, 802 (3d Cir. Pa. 1987).  Given the admissions of Plaintiffs, and this Court's prior judicial determinations, the claims in this case will continue to be governed by the abuse of discretion standard.

[2] The abuse of discretion standard is essentially the same as the arbitrary and capricious standard in the ERISA context. *See Miller v. Am. Airlines, Inc.,* 632 F.3d 837, 845 n.2 (3d Cir. 2011); *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 n.4 (3d Cir. 1993). Under either articulation of the applicable standard, the question for the Court is whether the plan administrator's interpretation of the ERISA plan is reasonable.  *McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan*, 340 F.3d 139, 142-43 & n.2 (3d Cir. 2003).

standard, the Court must uphold the plan administrator's decision unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 527 (citation omitted). "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009) (quotation and citation omitted).

Courts also review various procedural factors in the administrator's decision-making process, as well as structural concerns regarding how the particular ERISA plan was funded, to determine if the conclusion was arbitrary and capricious. *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. Pa. 2011); *see Estate of Schwing*, 562 F.3d at 525-26 (3d Cir. 2009); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116-17 (2008). "Whereas '[t]he structural inquiry focuses on the financial incentives created by the way the plan is organized,' i.e., whether there is a conflict of interest, 'the procedural inquiry focuses on how the administrator treated the particular claimant.'" *Miller*, 632 F.3d at 845 (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007)). Courts consider numerous types of "irregularities" to determine "whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality." *See id.* (citing *Post*, 501 F.3d at 165). Courts "determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." *Glenn*, 554 U.S. at 117.

II. <u>Legal Standards Applied</u>

Here, as Plaintiffs argue, several structural and procedural factors cast doubt on the Administrator's neutrality. Under the terms of the Plan, Abbott is vested with discretionary authority to interpret the provisions of the Plan, but it also pays benefits. This presented the Plan

with a conflict of interest.  *See Miller v. American Airlines*, 632 F.3d 837, 847 (3d Cir. 2011); *see also Metropolitan Life*, 554 U.S. at 112; *Firestone Tire & Rubber Co. v. Burch*, 828 F.2d 134, 144 (3d Cir. 1987).  The Administrator was also conflicted because benefits are payable to former employees. The Third Circuit recognizes that the denial of claims of former employees is subject to greater scrutiny than the denial of claims of current employees because the employer's interest in maintaining the morale of current employees is missing in the context of former employees.  *Post*, 501 F.3d at 164.

In addition, an Administrator's failure to consider certain evidence demonstrates self-serving selectivity, which taints the claims evaluation process.  Here, the Administrator ignored, or failed to properly consider, evidence of earnings and factual support for distance claims submitted by the Plaintiffs at all stages of the claim process and most recently on remand from this Court.

Finally, the Court takes into consideration that the Plan failed to provide information reasonably necessary to prosecute appeals.  Despite Plan and Department of Labor regulations that charge the Plan with providing relevant information to participants upon request, when Plaintiffs requested information on how the Plan determined compensation and distance the Plan Administrator failed to provide them with adequate information.  The Plan provided only the Plan itself and the Summary Plan Description, which say nothing about the Plan's method for determining distance and compensation claims.  When the Plan finally did provide claimants with an explanation of the "workload center" methodology administered by ZS Associates in determining distance claims, the explanation failed to provide adequate particularized information to assess the fairness and accuracy of the distance calculations.  For example, although ZS Associates explained their methodology, they did not clearly show how it was

applied in each individuals situation, for example, by listing all of the doctors in the assigned

territory, along with the workload value assigned to them, and by showing clearly the geographic

center of the territory and how the weighting contributed to the final determination of weighted

workload center.  Taken together, these irregularities cast further doubt on the Administrator's

neutrality.

In this Court's first opinion and order on cross motions for summary judgment in this

case, the Court expressed skepticism with the Administrator's methodologies for assessing

compensation and distance claims under the Plan, especially in light of the Administrator's

conflict of interest.  The Court remanded the claims for further review by the Administrator in

light of the Court's disapproval of the methodologies used to analyze distance and compensation

claims.  On the instant motions, the Court finds that the decisions of the Plan Administrator to

deny benefits with respect to each plaintiff were arbitrary and capricious.  In general, the

decisions of the Plan Administrator were arbitrary and capricious, especially in light of the

conflicts of interest, because the Plan Administrator ignored facts and individual circumstances

of the Plaintiffs and the plain language of the Plan.

Specifically, Veltri, Mastropierro, and Betts are entitled to severance benefits and it was

an abuse of discretion for the Plan Administrator to deny them benefits under the Plan,

particularly after the Court remanded the compensation claims and instructed the Administrator

to examine actual, instead of hypothetical earnings.  Upon remand, the Administrator developed

a new methodology with which to examine actual, instead of hypothetical earnings, and using

this methodology concluded that Veltri, Mastropierro and Betts each would have experienced a

reduction in compensation greater than 10%, entitling them to benefits under the Plan.  The

Court has already held that the Administrator's use of its initial methodology, which examined

hypothetical "eligible" earnings rather than actual 2006 earnings, was an abuse of discretion. The reasons for that decision continue to apply here. Here, the Administrator again ignores facts and evidence and ignores the plain language of the Plan, by using "target levels" instead of actual compensation, and by failing to explain or attempt to account for discrepancies between compensation information submitted by Plaintiff and information utilized by the Administrator. The Administrator acted arbitrarily in using a methodology that ignored reliable facts and evidence. The Administrator's continued adherence to flawed methodology continues to be an abuse of discretion, and the Administrator's new methodology clearly shows that Veltri, Mastropierro and Betts, are entitled to severance benefits. While the new methodology is not perfect, it is supported by the language of the plan and common sense, and therefore should be upheld. Accordingly, Veltri, Mastropierro and Betts are entitled to have their claims paid by the Administrator.

The Administrator's decisions to deny Bishop's claims were also arbitrary and capricious and abuses of discretion. Although Bishop has not established that his cash compensation claim should be paid, it is clear that the Plan Administrator ignored the evidence submitted by Bishop and therefore the Plan's decision not to pay is arbitrary and capricious. In conjunction with the parties' prior summary judgment briefs, Abbott credited Bishop with $154,235 in "eligible" earnings, and Bishop claimed that his total actual cash compensation in 2006 was $159,516. On remand, the Plan Administrator asserted that Bishop's 2006 Kos actual compensation was $157,079, *i.e.*, roughly $3,000 dollars more than the Administrator credited Bishop with in the original claim process. Bishop asserted on remand that he had cash earnings in excess of $220,000, *i.e.*, almost $60,000 more than Bishop had claimed in the original claim process. He submitted a declaration and his 2006 W-2 form as evidence. The W-2 form reflects earnings in

excess of the amount Bishop claims.  The Administrator claims that a similarly situated individual that stayed at Abbott during 2007 had cash compensation of $183,030.36.

The Administrator denied Bishop benefits based on the numbers it chose and without attempting to explain the discrepancy between Bishop's evidence and the evidence the Administrator obtained and utilized.  Had Abbott credited the figure Bishop provided during the remand process, Bishop would clearly be entitled to benefits under the new compensation methodology.  However, it is unclear whose compensation information is correct, and Abbott has not provided much, if any, information attempting to account for the discrepancy. The Administrator's selectivity in the use of evidence demonstrates a problem with the claims evaluation process, which is compounded by the fact that Abbott provided no explanation for its selection of which evidence to credit, beyond a footnote acknowledging the discrepancy. Accordingly, although it is not clear that Bishop was entitled to have his compensation claims paid, Abbott's decision to deny benefits was arbitrary and capricious in that it seemed to ignore certain evidence and credit other more helpful evidence without explanation.

Bishop is entitled to summary judgment on his distance claim, which the Administrator gave little or no attention to on remand.  The Administrator apparently took a narrow view of this Court's Opinion and Order imploring the Administrator to consider commuting time and obstacles in its determination of what constitutes 50 miles to principal place of employment under the Plan.  This is apparent because the Administrator did not even read the Court's Order as having anything to do with Bishop's distance claim, and accordingly failed to consider it altogether on remand.  The Court's Order, however, did not limit itself to LaMartina's distance claim.  Bishop's claim, too, deserved further review, in light of his arguments before and after remand that despite the Administrator's determination that the distance was less than 50 miles,

36

the actual driving distance from Bishop's residence to individual stops in the new territory averaged in excess of 90 miles.  In fact, Bishop submitted evidence showing that 20 calls in his new territory were over 200 miles from his home, and 50 calls were at least 100 miles from his home.  (*See* AR 2775).  In response, the Administrator wrote that Bishop did not "identify any unusual objects that impacted his commute,"  (AR 2823 n.1) and during the initial claim process, the Administrator relied upon ZS Associates and did not analyze or consider the information provided by Bishop in support of his claim.  Ignoring the fact that actual driving distance to 70 of Bishop's calls exceeded 100 miles, and ignoring the evidence presented by Bishop that the average driving distance to his calls exceeded 90 miles, was arbitrary and capricious of the Administrator, especially in light of this Court's previous opinion and order holding that it was an abuse of discretion by the Administrator to ignore commuting time in determining distance claims.

LaMartina is also entitled to summary judgment on his distance claim because the Administrator's decision was arbitrary and capricious.  The territory LaMartina was originally assigned by Abbott required him to make calls on doctors which required well over 50 miles of travel.  The Court previously recognized that the Administrator's determination with respect to LaMartina and its methodology in general was unreasonable.  Instead of re-analyzing LaMartina's distance claim with a more reasonable methodology, which would undoubtedly result in a finding that LaMartina did indeed have "Good Reason", the Administrator denied LaMartina's claim because the Administrator claims LaMartina was offered an alternate territory, the Glen Cove territory, before he resigned and claimed severance benefits. The record shows that LaMartina was originally offered the Yonkers territory, and only after he declined to accept the new territory and instead opted in some fashion to take severance was he, at the last

minute, offered the Glen Cove territory.  In fact, the record suggests that on March 7, 2007, when LaMartina was credited with claiming severance benefits by the Administrator, he had not yet even been given maps and other information specifically describing the second territory.

LaMartina's distance claim is another example of the Administrator clearly going to great lengths in its interpretation of the facts and the Plan terms to deny benefits to a Plan participant. The Plan does not explicitly allow Abbott to retract an initial territory offering and instead offer another.  In fact, the Plan says that "*any change* of the Participant's principal place of employment to a location . . . 50 miles from the Participant's principal residence immediately prior to December 15, 2006," constitutes "Good Reason."  (AR 4 (emphasis added)).  By using the term "any change", the Plan suggests that it is the change of principal place of employment that triggers "Good Reason".  The Plan does not explicitly provide Abbott with any way to cure or claw back the "Good Reason" after it has been triggered.  The original letter from the Administrator denying LaMartina's claim for benefits actually misstates the facts, as it says that LaMartina's "initial new principal place of employment in the Glen Cove, NY territory was only 21.5 miles from [LaMartina's] principal residence."  Of course, the "initial new" principal place of employment assigned to LaMartina was in Yonkers, New York, and no one at this point in the litigation disputes that.  Accordingly, as "any change" to the Participant's principal place of employment to a location 50 miles from the Participant's principal residence constitutes "Good Reason", LaMartina's change to the Yonkers territory, which is more than 50 miles from his residence under any reasonable interpretation, was "Good Reason" and any subsequent territory offering does not cure that.

In addition, although there is no document clearly evidencing that LaMartina communicated his decision to take severance benefits prior to March 7, 2007, several documents

38

suggest that LaMartina *at least attempted* to communicate his desire to claim severance benefits before the Glen Cove territory was offered to him.  Defendants cannot dispute that LaMartina at the very least made it clear that he disputed Abbott's calculation of the distance of the Yonkers territory as being within 50 miles of his principal residence.  However, no one at Abott informed LaMartina how he could go about "officially" claiming severance benefits until after they offered him the Glen Cove territory.  This is important, because the Plan is not entirely clear in this respect. The Plan says: "A termination of employment by the Participant for Good Reason for purposes of this Plan shall be effectuated by giving the Company written notice of termination setting forth in reasonable detail the specific conduct of the Company that constitutes Good Reason and the specific provisions of this Plan on which the participant relied."  Elsewhere in the Plan, it states: "Your notice [of Good Reason] should be sent, or given to, Senior Manager, Employee Relations."

It seems that Abbott's case against LaMartina on summary judgment boils down to two arguments: (1) it believes that it was entitled to cure its initial offer of a new territory that was further than 50 miles with one that was closer, and (2) it believes that LaMartina's initial refusal of the Yonkers territory did not amount to a notice of "Good Reason" under the Plan (presumably because it wasn't in writing, or because it was communicated to the wrong person, or because it didn't use the "magic words").

Taken as a whole then, the Administrator's actions in interpreting the Plan terms to allow itself a right to cure its initial territory offering to LaMartina, and in interpreting the facts and Plan terms to designate March 7, 2007, as the date of LaMartina's severance claim, constitute an abuse of discretion.  Indeed the Administrator offers no support for its implied argument that the Plan allows it to switch the territories it offered to its employees despite the Plan language that

conditions "Good Reason" on "any change" to a principal place of employment more than 50 miles from a participant's residence.  Likewise, the Administrator offers no support for its interpretation of the Plan terms and facts with regard to the date of LaMartina's claim for benefits, an interpretation that outright ignores the week LaMartina spent disputing Abbott's assertion that the Yonkers territory was within 50 miles from LaMartina's home.

That Abbott acted arbitrarily and capriciously when it adjudicated Bishop and LaMartina's claims is supported by the structural and procedural considerations outlined throughout the discussion, *supra*: Abbott is conflicted and the participants are former employees; Abbott ignored material evidence presented by claimants; Abbott failed to respond adequately to information requests by Plan participants; on remand the Administrator virtually ignored Bishop's distance claim.  In addition, the Administrator's rigid adherence to a formula for computing distance that causes unreasonable results is further evidence that the Administrator's determinations were arbitrary and capricious.  While the Court's previous opinion suggested that the Administrator consider "obstacles," it also suggested that the administrator consider "commuting time," and the Administrator's continued adherence to its "workload center" analysis is evidence that the Administrator failed to do so.

Accordingly, as the Administrator had ample opportunity to demonstrate its neutrality and give fair consideration to the claims of the Plaintiff, but instead rejected the opportunity, benefits should be awarded to all of the Plaintiffs.  *See Carney v. International Broth. Of Elec. Workers Local Union 98 Pension Fund*, 66 Fed. Appx. 381, 386-87, 2003 WL 21129851, 4 (3d Cir. 2003).  Plaintiffs motion for summary judgment is therefore granted, and the claims are ordered paid.

Plaintiffs further request leave to file an application for attorney's fees.  Fees and costs may be awarded pursuant to 29 U.S.C. § 1132(g)(1).  *Hardt v. Reliance Standard Life Ins. Co.*, 2010 U.S. LEXIS 4164, 130 S.Ct. 2149 (2010).  The award in an ERISA action, however, is discretionary.  *Id.*  Courts consider the following factors in making a determination:  (1) the non-prevailing party's bad faith or culpability; (2) the ability of that party to satisfy an attorney's fee award; (3) the deterrent effect of such award on that party; (4) the benefit conferred on members of the plan as a whole; and (5) the relative merits of the parties' positions.  *Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir. 1983); *Hahnemann Univ. Hosp. v. All Shore, Inc.,* 514 F.3d 300, 310 (3d Cir. 2008).  Here, Plaintiffs have not shown that the Plan Administrator's actions have been in bad faith, nor have they shown that any of the other factors are implicated.

**CONCLUSION**

For the reasons stated *supra*, the Court will grant Plaintiffs' motion for summary judgment in part, and deny Defendant's motion for summary judgment in its entirety.  Plaintiffs; motion will be granted in all respects save for the request for an award of attorneys' fees.  The Court will issue an appropriate order and judgment.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

January 30, 2013